# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | Case No. 2:12-cr-240(2) |
| v. | Judge Peter C. Economus |
| **SCOTT A. REYNOLDS,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendant.** | |

This matter is before the Court for consideration of Defendant Scott A. Reynold's Motion to Suppress Statements. (Dkt. 16.) For the reasons set forth below, the Defendant's motion is **DENIED**.

**I.**

The Defendant is charged, along with Co-Defendant Timothy L. Hale, with knowingly possessing a firearm with an altered serial number in violation of 18 U.S.C. § 922(k). (*See* Dkt. 1 at 1.) He now moves to suppress statements made to ATF Special Agent James Bajus and Columbus Police Officer Jerry Orick during an encounter that occurred on July 16, 2010 at the Defendant's residence. Bajus and Orick were investigating the Defendant in connection with a theft of firearms from an individual named Robert White. The Defendant moves to suppress the statements at issue on the grounds that they were made while in custody in the absence of *Miranda* warnings.

**II.**

A hearing was held on the Defendant's motion on May 15, 2013. During the hearing, the Government called both Bajus and Orick as witnesses. The Defendant called no witnesses. While there were minor variations between the testimony of Bajus and Orick, their accounts of

what transpired during their encounter with the Defendant were consistent for purposes relevant to the Court's consideration of the Defendant's motion to suppress.

During the afternoon of July 16, 2010, Bajus and Orick arrived at the Defendant's residence located at 3300 Oakland Hills Drive, Pickerington, Ohio in an unmarked car. Both officers were wearing civilian clothing, and, while armed, their weapons were not visible. They sought to interview the Defendant in connection with their investigation into the theft of firearms from Robert White because they had identified the Defendant as being possibly involved with the theft.

They parked their car in the driveway, walked onto the porch, and knocked on the door. The Defendant answered the door and the officers introduced themselves and showed their credentials. According to Bajus, he informed the Defendant that the Defendant was free to terminate the interaction at any time, but the Defendant nevertheless agreed to speak to the officers and exited the house on his own volition. The officers then began to interview the Defendant on the porch of the residence. At some point, their discussions were interrupted by the Defendant's cousin who emerged from the house. The cousin presented an identification at the request of the officers, and then went back into the house at Orick's request. Subsequently, according to Orick, the interview was moved to the driveway of the residence to ensure that it would be more difficult for anyone in the house to overhear the conversations.

Sometime after the discussion was moved to the driveway, the Defendant's sister arrived on the scene. She was familiar with the officers as she had also recently been questioned by them in connection with their investigation (she had worked as an in-home caregiver for Robert White), and berated her brother for talking to them. At this point, the Defendant requested that the interview be moved into the officer's car. After relocating into the car, with the Defendant in

2

the front passenger seat, Orick in the driver's seat, and Bajus in the rear seat, the Defendant's mother arrived on the scene. The Defendant then allegedly informed the officers that he would provide information on the firearm theft and the location of the missing weapons after his mother and sister went into the house. However, the Defendant's mother placed a phone call to her brother (the Defendant's uncle), a police officer in Wilmington, Delaware, seeking advice on handling the situation. At one point, the Defendant's mother went so far as to put Orick on the phone with the uncle for a discussion (Orick declined to provide details of the investigation to the uncle).

The Defendant's mother then relayed to the Defendant that the uncle had said that the Defendant should not speak to the officers unless they had a search warrant. The Defendant then announced to the officers that he would like to end the interview, exited the car, and returned to the residence. The officers then left the scene.

The officers differed in their estimates of the amount of time that the entire encounter lasted, with Bajus' estimate at 15 minutes and Orick's estimate at 30 to 45 minutes. Bajus described the officers' interactions with the Defendant as being "calm" throughout the interview. While the interview was conducted on the porch and in the driveway, neither Orick nor Bajus stood between the Defendant and the entrance to the residence. Finally, according to the officers, the interactions with the Defendant's mother and sister were more confrontational.

**III.**

Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), "a suspect under custodial interrogation must be given notice of her Fifth Amendment right against self-incrimination." *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000). "Any incriminating statements obtained in violation of *Miranda* may not be admitted and used against the defendant at trial."

*Id.* However, "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

Here, the Government does not dispute that the Defendant was never given *Miranda* warnings either subsequent to or during his conversations with Bajus and Orick on July 16, 2010. The Defendant argues that he was in their custody during the encounter and the absence of the warnings should thus result in the suppression of his statements at trial. Accordingly, the Court must determine if the Defendant was in custody during any portion of his interactions with Bajus and Orick. Concluding that he was not, the Court denies the Defendant's motion to suppress the statements made during the interview.

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (citations and quotations omitted). The inquiry must focus on the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323. "The question in the end is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them." *United States v. Panak*, 552 F.3d 462, 471 (6th Cir. 2009) (emphasis in original).

The Sixth Circuit has identified several factors relevant to the "custody" inquiry, including: 1) "whether a reasonable person in the suspect's situation would have believed that she was free to terminate the interrogation and leave;" 2) "the purpose of the questioning;" 3) "whether the place of the questioning was hostile or coercive;" 3) "the length of the

questioning;" (4) "whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so;" 5) "whether the suspect possessed unrestrained freedom of movement during questioning;" and 6) "whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." *Crossley*, 224 F.3d at 861.

The officers arrived at the residence in an unmarked car, and wore civilian clothing. The entire encounter lasted no more than 45 minutes. While the officers conceded that one purpose of their interview with the Defendant was to obtain potentially incriminating evidence against him, an examination of the other applicable factors reveals that the officers never restrained the Defendant's freedom of movement to the degree associated with a formal arrest during the encounter. In other words, no reasonable person in the Defendant's position would have believed that he or she was in custody or under arrest during the encounter.

As to the whether the place of questioning was hostile or coercive, the conversations occurred on the porch and in the driveway of the Defendant's residence in broad daylight. While the conclusion of the interview occurred in the officers' car, the record is undisputed that the Defendant himself requested that the interview be moved to that location, presumably to shield the discussions from his sister and/or mother's presence. Bajus and Orick described the overall tone of their interactions with the Defendant as calm. These facts, taken together, are indicative of an environment that was not hostile or coercive.

The testimony also indicates that the Defendant possessed unrestrained freedom of movement during the entire encounter. While the officers were armed, their weapons were not visible. They did not use force, or threaten to use force against the Defendant. The Defendant was not placed under arrest. The officers never restrained the Defendant with handcuffs or

shackles. Prior to the interview moving into the car, the officers did not position themselves between the Defendant and the door to the residence. Further, it was the Defendant who requested that the interview be moved into the officers' car, a request with which the officers complied. This fact indicates that the Defendant was able to exercise control over the interaction. At the point in time at which the Defendant decided to end the interview, he simply exited the car, and walked back into the residence with no interference by the officers.

Finally, and perhaps most significantly, the record is undisputed that the Defendant voluntarily agreed to speak to the officers even after being informed by Bajus that he was free to terminate the interaction at any time he wished. The Defendant proceeded to speak with the officers, and then exercised his right to terminate the encounter upon being advised by his uncle that cooperating with them might not be in his best interest. The officers respected the Defendant's decision to end the interview, and made no attempt to force the Defendant to continuing speaking with them.

The circumstances identified above lead the Court to conclude that the Defendant was not in police custody during his conversations with Bajus and Orick on July 16, 2010. Accordingly, the officers were not required to provide *Miranda* warnings, and the statements made by the Defendant during the interview are not excludable on the grounds that they failed to do so.

**IV.**

For the foregoing reasons, Defendant Scott A. Reynold's Motion to Suppress Statements (Dkt. 16) is **DENIED**.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE